# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. LAMAR ROSS

### Direct Appeal from the Criminal Court for Shelby County
### No. 02-08113     Joseph B. Dailey, Judge

---

### No. W2003-02823-CCA-R3-CD  - Filed November 22, 2004

---

The defendant, Lamar Ross, was indicted by the Shelby County Grand Jury on two counts of aggravated rape, a Class A felony, under alternate theories, for one offense. Following a jury trial, he was convicted of both counts, which were merged into a single judgment of conviction, and sentenced by the trial court as a Range I, violent offender to twenty-four years in the Department of Correction. In a timely appeal to this court, he challenges the sufficiency of the evidence and the sentencing imposed. Based on our review, we modify the conviction in Count 2 to rape, a Class B felony, in accordance with the offense with which the defendant was charged. Further, we conclude that two of the four enhancement factors are inapplicable, in light of the United States Supreme Court's subsequent opinion in Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004). Accordingly, we modify the aggravated rape conviction in Count 2 to rape, which merges into the conviction for aggravated rape in Count 1, and reduce the defendant's sentence to twenty-two years in the Department of Correction.

#### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. GARY R. WADE, P.J., filed a concurring and dissenting opinion.

Robert Wilson Jones, Shelby County Public Defender, and Tony N. Brayton, Assistant Public Defender, for the appellant, Lamar Ross.

Paul G. Summers, Attorney General and Reporter; Jennifer Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The victim in this case, J.F.,[1] is a resident of the Barry Homes, a Memphis public housing development reserved for the physically and mentally disabled. At approximately 11:50 p.m. on July 1, 2002, the victim reported to Carolyn Delbridge, a Memphis Housing Authority criminal investigator assigned to the building, that earlier in the day a man had enticed him into walking with him to a nearby abandoned public housing complex, where he had forced the victim at knifepoint to perform oral sex and had penetrated him anally with his penis. From the victim's description, Delbridge recognized the defendant, who was a regular visitor in the Barry Homes, and whom she had seen in the building earlier that afternoon.

The victim subsequently led Delbridge, her supervisor, and a group of Memphis police officers to the abandoned housing complex and pointed out the room in which the rape occurred. There, the officers discovered the defendant asleep on the floor, a gray knife matching the victim's description of the weapon used in the attack underneath a blanket beside his left hand. In addition, the victim immediately identified the defendant as the perpetrator when the officers removed him from the room. As a result, the defendant was arrested and charged with two counts of aggravated rape, based on his use of a weapon in the attack and his rape of a victim he knew or had reason to know was mentally defective.

At the defendant's September 22-24, 2003, trial, the victim testified he was forty-one years old and had lived in the Barry Homes Housing Development in downtown Memphis for the past two years and four months. He said he was sitting outside the building on July 1, 2002, when a man dressed in blue jeans and a black shirt with a black design approached and asked him to accompany him to where he was living, saying something about wanting to show the victim a "cat hole" and also about having the victim play basketball with him. The victim said he declined, but the man grabbed him by the arm and told him to come with him, repeating that he had something to show him. As they walked together down the street, the man introduced himself to the victim as "Lamar Ross."

After leading the victim into an upstairs vacant room inside the nearby abandoned Lauderdale Court housing project, the man suddenly pulled down his clothes, telling the protesting victim that he had to "do [his] job." The victim said he refused and tried to leave, but the man grabbed him by the neck, pulled out a gray knife, and threatened that he would be "a dead sucker" if he did not "suck his penis." Because he was afraid the man would hurt him, the victim complied. He said that afterwards, the man forced him to lower his pants and then penetrated his rectum with his penis four times, which hurt him. When finished, the man forced him to wait and walk back toward the Barry Homes complex with him, threatening that the victim was "gonna get [his] butt kicked again" if he refused.

The victim testified that when he returned home he first related the incident to the manager of his building, who refused to help, and later to Ms. Delbridge, the building's security officer, who called her supervisor and the police. After describing the rapist, he led officers to the abandoned housing complex, where the police discovered a man fitting the rapist's description asleep in the

---

[1] It is the policy of this court to identify victims of sexual assault by their initials only.

room where the incident occurred. The victim testified he immediately recognized and identified the man as the perpetrator when the police brought him out of the room. However, the victim was unable to identify the defendant at trial.

On cross-examination, the victim testified he completed the eleventh grade but did not graduate. He was unsure of the exact time the incident occurred, but was confident it was before dark. He was also confident that the defendant told him his name was "Lamar Ross." He acknowledged he had reported the time of the incident as 4:00 p.m. in his statement to police, and had said that Ms. Delbridge told him the perpetrator's name was Lamar. He testified he described the perpetrator as a tan or "khaki-skinned" man with facial hair, shorter than he was, and dressed in blue jeans, a black shirt, and white tennis shoes. The victim said he did not think the defendant had been wearing a condom, and he did not ejaculate in his mouth. He denied having told anyone that the defendant ejaculated, but said he had mentioned that he saw "some white stuff caked around [the defendant's] penis," which had an "ill smell to it." The victim acknowledged he told police that he was 5' 6" and thought his assailant was six feet tall. He was unable to say whether six feet was taller than his height, but indicated that the man who raped him came up to his ear. On redirect, he affirmed that he had been able to point out the defendant to the judge in an earlier court proceeding in the case.

Carolyn Delbridge testified she was working at the Barry Homes as a criminal investigator for the Memphis Housing Authority on July 1, 2002, when the "crying – shaken – real distraught" victim came to her at 11:50 p.m. and reported that "somebody made him put their nasty thing in his mouth." She said the victim related that he had been sitting on the stoop when a man wearing dark jeans, a black long-sleeved shirt with white writing on it, and white tennis shoes asked him for a beer. The victim told her that he refused to buy him a beer, and the man asked him to accompany him to the store. However, when they reached the abandoned Lauderdale Court Apartments, the man "pushed . . . and shoved him" inside an apartment, pulled a gray knife, forced him to go upstairs into a room with a folded blanket on the floor and a pink candle in the window, and then made him perform oral sex and anally penetrated him. Delbridge stated that the victim did not know what a condom was, but answered in the affirmative when she asked if he had been wet where the man penetrated him. She agreed that the victim was mentally disabled, or "a little slow."

Delbridge testified that the victim led her, her supervisor, and several Memphis police officers to the apartment, where they found the defendant asleep on some folded blankets on the floor. She said the victim had previously described the perpetrator's foot odor, and she and the other officers were able to smell the defendant's feet "as soon as [they] hit that bedroom." She confirmed that the victim identified the defendant as his rapist at the scene, and testified that a gray knife was discovered near the defendant's left hand on the floor under a blanket. On cross-examination, Delbridge testified that the defendant checked into the Barry Homes for a visit at 5:00 p.m. and left around 5:30 or 5:40 p.m. She said the victim told her that the rape occurred between 8:00 and 8:30 p.m. She acknowledged she recognized the defendant from the victim's initial description of his rapist, but was confident she did not tell the victim his name. On redirect, she testified she

recognized the defendant from the victim's description of his perpetrator's bad case of acne and his clothing.

Memphis Police Officer Christopher Patterson testified that shortly after midnight on July 2, 2002, the victim led him and several other officers to the Lauderdale Court apartment in which the attack had occurred, where they discovered the defendant asleep on the floor. He confirmed that the victim identified the defendant at the scene as the man who had raped him.

Jerry Hamilton testified he was the manager of clinical services for Case Management Incorporated, a private agency that assists clients with mental health problems to locate housing, food, and other resources in order to "make adjustments to the community" and to function as independently as possible. He said that the victim, a client of his company, had been diagnosed with a mood disorder and mental retardation and received a government disability check based on his mental disability.

Darna Davis testified she was a caseworker for Case Management, Inc., and had managed the victim's case since May. She said her understanding was that the victim had been diagnosed with both mental retardation and a mood disorder. She stated that her company managed the victim's money, paid his bills, filled and delivered his monthly prescriptions, and provided transportation for him to and from the clinic. However, the defendant lived on his own at the Barry Homes, was responsible for taking his medication daily, and appeared to her to be able to take care of himself on a daily basis.

Nina Sublette, a nurse practitioner who was accepted by the trial court as an expert in the field of forensic nursing, testified she examined the victim at the Memphis Sexual Assault Resource Center at 2:30 a.m. on July 2, 2002. Although she observed nothing unusual with respect to the victim's mouth and lips, she found four subacute lacerations to his anal verge, or the wrinkled part of his rectum, as well as a larger laceration located outside the anal verge at the "peri-anal skin area." All five lacerations bled easily upon slight manipulation. Sublette opined that the injuries were "very recent," had definitely occurred within the past twenty-four hours and probably within the past twelve, and were consistent with "blunt penetrating trauma." She testified there was no semen detected on the oral or rectal swabs she collected from the victim or from his underwear. On cross-examination, Sublette testified she had estimated the time of the assault as 4:00 p.m. based on what the victim told her. She acknowledged the victim told her he thought his assailant wore a condom, but could not recall if she had to first explain to him what a condom was.

The defendant elected not to testify and rested his case without presenting any proof. After deliberating, the jury returned guilty verdicts in both counts of the indictment. At the conclusion of the sentencing hearing, the trial court announced that the convictions would be merged into a single judgment of conviction and applied the following enhancement factors to the offense: (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; (6), the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and (7), the personal injuries inflicted upon

the victim were particularly great.  Tenn. Code Ann. § 40-35-114(2), (6), (7) (2003).  Without specifying which, the trial court also found that because of the alternate theories under which the defendant had been convicted of the two separate counts, which had merged, either enhancement factor (5), the victim was particularly vulnerable because of age or physical or mental disability, or enhancement factor (10), the defendant possessed or employed a deadly weapon during the commission of the offense, applied.  See id. § 40-35-114(5), (10).  Finding no mitigating factors applicable, the trial court enhanced the defendant's sentence from the presumptive midpoint of twenty years for a Range I offender convicted of a Class A felony to twenty-four years.

## ANALYSIS

### I.  Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence for his aggravated rape conviction in Count 2, arguing that the State failed to introduce sufficient proof that the victim was mentally defective or that the defendant knew or should have known of his condition.  The State concedes the evidence was insufficient to sustain a conviction for aggravated rape in Count 2, making the concession only because that count of the indictment mistakenly charged the defendant with rape, rather than aggravated rape.  However, the State contends ample proof was presented that the victim was mentally defective, and the evidence is sufficient to sustain a rape conviction on that basis.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

<u>Bolin v. State</u>, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing <u>Carroll v. State</u>, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  <u>See</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

Count 2 of the indictment, which charged aggravated rape based on the mental status of the victim, alleged that the defendant:

> [O]n July 1, 2002 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and intentionally sexually penetrate [J.F.], and having reason to know that the said [J.F.] was mentally defective, in violation of T.C.A. 39-13-502, against the peace and dignity of the State of Tennessee.

The aggravated rape statute provides in pertinent part:

> (a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (3) The defendant is aided or abetted by one (1) or more other persons; *and*
>
> (A) Force or coercion is used to accomplish the act; or
>
> (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless.

Tenn. Code Ann. § 39-13-502(a)(3) (2003) (emphasis added).

As noted by the State, although the indictment denominates the offense as "Ag. Rape" and references the aggravated rape statute, it omits the necessary element of the defendant's having been aided or abetted by one or more other persons in the commission of the rape.  Therefore, the offense actually charged in the indictment is rape, defined in pertinent part as:

> unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:
>
> (3) The defendant know or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]

Tenn. Code Ann. § 39-13-503(a)(3) (2003).  Apparently, the trial court also omitted the "aided or abetted" language in its instructions to the jury.  The typewritten jury instructions included in the record reflect the following instructions under "Aggravated Rape":

> Any person who commits the offense of aggravated rape is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
>> that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant;
>>
>>> and
>>
>> that force or coercion was used to accomplish the act, and the defendant was armed with a weapon or any article used or fashioned in a manner to lead the alleged victim reasonably to believe it to be a weapon;
>>
>>> or
>>
>> that the defendant knew or had reason to know that the alleged victim was mentally defective, mentally incapacitated or physically helpless;
>>
>>> and
>>
>> that the defendant acted intentionally, knowingly or recklessly.

Thus, the trial court provided the correct instructions with respect to the lesser-included offense of rape.

A defendant cannot be convicted of an offense that was not charged in an indictment.  See State v. Trusty, 919 S.W.2d 305, 314 (Tenn. 1996), overruled on other grounds by State v. Burns, 6 S.W.3d 453 (Tenn. 1999).  We conclude, therefore, that the defendant's conviction for aggravated rape under Count 2 of the indictment constitutes plain error and must be reversed.  See State v. Joe David Sloan, No. W2000-02861-CCA-R3-CD, 2002 WL 1558586, at *5 (Tenn. Crim. App. Jan. 4, 2002) (reversing defendant's conviction of felony evading arrest and reducing conviction to misdemeanor evading arrest on basis that indictment charged misdemeanor offense rather than

felony).  The question that now remains is whether there was sufficient evidence to sustain the defendant's conviction for rape, the offense actually charged in Count 2 of the indictment.

To prove the defendant guilty of rape under the mental defect of the victim theory of the indictment, the State had to show beyond a reasonable doubt that the defendant committed the rape of a victim he either knew or had reason to know was mentally defective.  The defendant contends that the State failed to prove this element of the offense, citing Darna Davis' testimony that the victim is able to care for himself on a daily basis and asserting that "[t]he record is devoid of any evidence that the victim suffered any mental defects."  We respectfully disagree.

Taken in the light most favorable to the State, there was ample evidence to show that the victim was mentally defective.  Jerry Hamiltion and Darna Davis, employees of the company that managed the victim's government disability income and provided assistance for him to live independently in the community, each testified that the victim had been diagnosed with mental retardation and a mood disorder.  In addition, Carolyn Delbridge, the Memphis Housing Authority investigator assigned to the victim's building who was familiar with the victim, testified that he was "a little slow" mentally.  Finally, the victim's own testimony revealed that he suffered from some sort of mental deficit.  For example, he believed that a "side effect" of medication meant that one experienced problems with one's side, was unable to say whether six feet was taller than five feet six inches, and appeared unable to appreciate apparent inconsistencies between his trial testimony and the statements he had made to police and housing authority officers.  The following exchange between defense counsel and the victim is illustrative of the victim's artless testimony:

> Q      Do you remember telling Ms. Delbridge that this person asked you for a bottle of beer?
>
> A      Right.
>
> Q      Do you remember telling her that?
>
> A      Yeah.
>
> Q      And do you remember telling her that this person wanted you to walk with him to the store?
>
> A      Right.  To some store.  I don't know.  It wasn't -- it wasn't -- it wasn't the store down there by our building, but it's a store somewhere else where he say he know where some at.  I didn't walk to the store with him.  So he told me to just come on in the house, and he would show me a something over there, and that's when he did that accident to me.

Q       Okay. All right. Do you remember telling Ms. Delbridge that this person forced you to go up the stairs and that you went up the stairs ahead of him and he had pulled a knife and was using that knife to make you go up the stairs?

A       Yeah, and you know, I followed behind him because he was in front of me. But I was behind him going up the stairs.

Q       Why -- had he pulled the -- do you remember telling Ms. Delbridge that this person had pulled a knife on you at the bottom of the stairs and forced you up those stairs at knife point? Do you remember telling her that?

A       Yeah, but see what he put -- when he went upstairs and pulled his clothes down, and I told him I ain't gonna do no sucking him. I said, "Man, you better forget that stuff." I went around -- when I was trying to go out the door, that's when he grabbed me from the door and laid me on the floor and then took his knife out trying to stab me. That's all I know.

Q       Let me make sure I understand what you're telling me. Okay.

A       All right.

Q       What you're telling me is that you told Ms. Delbridge that he pulled the knife out and made you go up the stairs?

A       Right.

Q       But today you're telling us you didn't see that knife until he was upstairs and he pulled his pants down and you had refused to suck his penis.

A       Right.

Q       Is that right?

A       Yeah, um-hum.

There was also sufficient proof from which the jury could conclude that the defendant knew or had reason to know that the victim suffered from a mental defect. The evidence was uncontradicted that the victim lived in a housing unit reserved for the physically and mentally disabled and that the defendant was a regular visitor in the building. The victim testified that the

-9-

defendant spoke with him outside the home and enticed him into accompanying him to where he lived by promises that he would either play basketball with him or show him "a cat hole" or something similar. From this evidence, the jury could have reasonably inferred that the defendant was aware of the type of residents who lived in the building, suspected the victim's mental disability, and realized from his conversation with him that the victim suffered from a mental deficit which he could exploit to commit the crime. We conclude, therefore, that the evidence is sufficient to sustain a conviction for rape under Count 2. Accordingly, we reverse the conviction for aggravated rape, as charged in Count 2, and reduce the offense to rape, a Class B felony, which merges into the conviction for aggravated rape in Count 1 of the indictment. See State v. Banes, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993) ("In the circumstance, in which two guilty verdicts are returned as to alternative charges, the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge. The judge should enter a judgment of conviction on the greater offense and a judgment merging the lesser offense into the greater.")

## II. Sentencing

As his next issue, the defendant contends that the trial court misapplied the enhancement factors upon which it relied to enhance his sentence beyond the presumptive midpoint in the range. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

As a Range I offender convicted of a Class A felony, the defendant was subject to a sentence ranging from fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2003). Our Sentencing Act provides that in calculating a sentence for a Class A felony, the trial court starts at the midpoint in the range, enhances the sentence as appropriate based on the existence of any enhancement factors its finds applicable, and then reduces the sentence based on the existence of any applicable mitigating factors. Id. § 40-35-210(c), (d), (e). However, the opinion of the United States Supreme Court in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the validity of the trial court's finding and application of certain enhancement factors to increase a defendant's sentence. In that case, the Court applied the rule in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000) ("Other than the fact of a prior conviction, any

fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"), to conclude that a criminal defendant's Sixth Amendment right to trial by jury encompasses the right to have the jury, rather than the judge, determine the existence of any sentence enhancements other than those based on facts reflected in the jury verdict or admitted by the defendant. Blakely, 542 U.S. at __, 124 S. Ct. at 2536-38. As the Blakely Court wrote:

> Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Id. at 2537 (emphasis in original) (citations omitted).

The trial court applied enhancement factor (2) based on proof of the defendant's out-of-state convictions for escape and uttering forged instruments. Blakely permits a trial court to enhance a defendant's sentence based on prior convictions, and the defendant does not challenge the application of this factor on appeal. The trial court also applied either enhancement factor (5) or enhancement factor (10), based on the jury's verdicts in the separate counts of the indictment, which merged into a single judgment of conviction. The defendant argued at sentencing and on appeal that neither of these enhancement factors was applicable because each was an essential element of one of the offenses of which he had been convicted, which had merged. The test for determining whether an enhancement factor is an essential element of an offense is whether the same proof necessary to establish a particular element would also establish the enhancement factor. See State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994). Because of the jury's guilty verdict in Count 2, by which it found that the defendant knew or had reason to know that the victim was mentally defective, we conclude that enhancement factor (5), a victim of the offense was particularly vulnerable due to mental disability, is appropriate to enhance the defendant's sentence for aggravated rape under the alternate rape theory in Count 1. However, enhancement factors (6) and (7), are both inappropriate under Blakely, as they were neither admitted by the defendant nor reflected in the jury's verdicts.

Given the two applicable enhancement factors and the absence of any mitigating factors, we conclude that an enhanced sentence of twenty-two years is appropriate in this case. Accordingly, we reduce the defendant's sentence from twenty-four to twenty-two years.

## CONCLUSION

Based on the foregoing authorities and reasoning, we modify the defendant's conviction for aggravated rape in Count 2 to rape, which merges into the conviction for aggravated rape in Count 1; reduce his sentence for aggravated rape to twenty-two years, to be served at 100% in the Department of Correction; and remand the case to the trial court for further proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE